JUDGE DAVID GUADERRAMA

FILED

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

2025 AUG 20  PM 5: 03

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY_____ DEPUTY

| | | |
|---|---|---|
| Mark R. Smigiel, | § | **EP 25CV0330** |
| Plaintiff | § | |
| | § | |
| v. | § | Case No. _____ |
| | § | |
| GECU Federal Credit Union, | § | Jury Trial: (X) Yes ( ) No |
| Defendant | § | |

## COMPLAINT

Plaintiff Mark R. Smigiel files this Complaint against Defendant GECU Federal Credit Union and alleges as follows:

### I. INTRODUCTION

1.  This action arises from Defendant GECU's discriminatory treatment of Plaintiff, a former in-house general counsel, based on a perceived mental impairment, in violation of the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. §§ 12101 et seq. Defendant subjected Plaintiff to a hostile work environment and wrongfully terminated Plaintiff's employment due to this perceived impairment.

2.  In the alternative, Defendant GECU's conduct constitutes intentional infliction of emotional distress ("IIED") under Texas law by engaging in extreme and outrageous behavior that caused Plaintiff severe emotional distress.

3.  Further in the alternative, Defendant GECU committed fraud by offering and inducing Plaintiff to accept employment with the intent to subject Plaintiff to discriminatory and harassing conduct, misrepresenting the nature of the employment.

### I. JURISDICTION

4.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) because this case arises under the laws of the United States, specifically the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. §§ 12101 et seq. ("ADA").

5.      This Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367(a) as these claims arise from the same case or controversy as the federal ADA claims.

## II. VENUE

6.      Venue is proper in the Western District of Texas pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district and Defendant conducts business in and resides in this district.

## III. PARTIES

7.      Plaintiff, Mark R. Smigiel, is an individual residing at 6275 Viale Del Sol Ave., El Paso, Texas 79932.

8.      Defendant, GECU Federal Credit Union, is a federal credit union with its principal place of business at 1225 Airway Blvd., El Paso, Texas 79925.  Defendant is an employer within the meaning of 42 U.S.C. § 12111(5) as it employs 15 or more employees.

## IV. FACTUAL ALLEGATIONS

9.      In 2022, Plaintiff, an experienced attorney, was offered employment as in-house general counsel by Defendant GECU, without Plaintiff's prior solicitation.  This was to be during a time Defendant GECU was converting from a state chartered credit union to a federal credit union. Defendant represented Plaintiff would serve as a valuable member of its executive team as its in-house general counsel with responsibilities typical of such role.  Plaintiff accepted the offer relying on Defendant GECU's representation about the role.

10.    Plaintiff was later asked to submit an application and complete job screening requirements and his employment began on January 1, 2023. Plaintiff's title was Vice President and General Counsel. Prior to Plaintiff beginning employment on January 1, 2023, Plaintiff had a long-standing relationship with Defendant GECU as a result of his serving as one of many outside counsel, performing a variety of tasks such as contract review and drafting, assisting with pre-litigation vendor disputes, providing regulatory guidance, and responding to third-party record requests.

## A. Different Treatment

11.    Upon commencement of employment on January 1, 2023 and at all relevant times, Defendant GECU treated Plaintiff differently from prior in-house general counsel, perceiving Plaintiff as having a mental disability within the meaning of 42 U.S.C. § 12102(1)(C), such as a perceived anxiety disorder or an Autism Spectrum Disorder.

12.    At all relevant times, Plaintiff's work was generally controlled by Defendant GECU by giving Plaintiff specific assignments. These would come from various executives either directly or through subordinates.

13.    At all relevant times, Plaintiff's responsibilities were generally focused on routine or isolated legal matters as assigned.

14.    Legal process assignments were assigned to Plaintiff by Senior Vice President Nicole Bradford or her subordinate employees from Compliance/Records. Even when legal matters were assigned, they would frequently be controlled or limited. For example, when some subpoenas/document requests were assigned, Plaintiff's role was to assess procedural issues and whether and when Defendant GECU was required to respond, but not to advise regarding the substance of the response itself. This, despite the fact that on occasions when Plaintiff was granted broader authority, Plaintiff identified compliance risks in standard practices, including Defendant

3

GECU creating documents, altering documents to include additional information as "clarifications" and making disclosures of member financial information to law enforcement requestors.

15.    Some subpoenas/records requests were assigned to Plaintiff, but others were not.

16.    Some legal process was assigned to Plaintiff, but other legal process in the same category was not.

17.    During his employment, Plaintiff expressed an interest and willingness to supervise responses to legal process in a more typical manner of an in-house counsel, which was denied. These requests were communicated to Nicole Bradford, Plaintiff's supervisor, Executive Vice President Hazel Kennedy, and Defendant GECU's CEO Crystal Long.

18.    Several categories of legal process requests assigned to Plaintiff were handled by Compliance clerks without the assistance of counsel before and after Plaintiff was an employee.

19.    Defendant GECU sought to make one of Plaintiff's primary responsibilities reviewing powers of attorney documents submitted to Defendant GECU. This role was assigned to Plaintiff by Senior Vice President Jacque Valdez.

20.    Preparing powers of attorney is an area of legal practice the Texas Bar has been moving towards permitting certified legal assistants to perform rather than attorneys.

21.    Defendant GECU did not typically use an attorney to review submitted powers of attorney before Plaintiff was hired or after Plaintiff was no longer assigned to reviewed them.

22.    Major legal decisions required approval from Plaintiff's supervisor, Exec. V. P. Hazel Kennedy, or other senior executives, such as Exec. V.P. Alex Rascon, Sr. V.P. and later Exec. V.P. Fernando Ortega or President and CEO Crystal Long.

23.    Plaintiff had no involvement with Board meetings, unlike prior in-house counsel.

4

24.     Plaintiff's supervisor repeatedly informed Plaintiff it was not necessary for him to attend organizational "Huddles", which were mandatory organization meetings for executives, managers and supervisors.

25.     Plaintiff's access to systems, databases and electronic files was limited and tightly controlled.

26.     Plaintiff was provided documents for assigned tasks, typically by email.

27.     Plaintiff was not provided access to the electronic files for Compliance/Records Requests for responding to legal process.    Instead, Plaintiff would be sent documents identified by Compliance/Record Request employees.    In the case of assigned subpoenas/record requests, sometimes a shared folder was created for the assigned subpoena/record request.

28.     Plaintiff was not provided access to the electronic files for Procurement for responding to contract review assignments.    Instead, Plaintiff was sent documents identified by Procurement or others.

29.     Plaintiff was not provided access to core systems that hundreds of other employees had access to that contained information regarding members, accounts, powers of attorney on file and other information.

30.     When Plaintiff required additional information for an assignment, such as clarifying information, clarification of whether correct or complete information or documents had been provided, additional vendor or contract information, information regarding a member, an address for sending a letter or account details, Plaintiff was required to request the information from other executives or employees.

31.     This process slowed assignment completion as response times varied based on other employees' availability and priorities.  This process created bottlenecks and frequently required re-review leading to delays in assignment completion and decision making.

32.     In addition to the process issues described above, at times, on routine tasks like legal process requests or powers of attorney where there was a deadline, Plaintiff was given assignments or provided documents or information late.

33.     Plaintiff being afforded access to additional systems, electronic files for legal process and electronic files for contracts would have been beneficial in Plaintiff performing his work.

34.     During his employment, Plaintiff requested access to additional systems, such as core systems, which was denied.

35.     During his employment, Plaintiff requested access to electronic files for legal process and contracts, which were denied.

36.     During his employment, Plaintiff requested that shared folders be created for access to a broader selection of legal process files and contracts, which was denied.

37.     Plaintiff had no staff or employees over whom he had supervisory responsibility.

38.     Eventually, Plaintiff was granted authority to ask for clerical assistance from administrative assistant Paula Castro when she had time, who was already responsible for supporting two senior executives, Executive V.P. Hazel Kennedy and Executive V.P. Alex Rascon.  She expressed and showed resistance to take on additional duties from Plaintiff.

39.     Plaintiff was nominally responsible for managing all claims and litigation.  However, Plaintiff was given either no information or limited information regarding employment litigation claims/lawsuits.  Plaintiff would sometimes be informed of regulatory based consumer complaints

and sometimes not. This information would have been beneficial to a general counsel in understanding, anticipating, and managing risk.

40.    On some regulatory based consumer complaints that Plaintiff was made aware of, Plaintiff had either no involvement or limited involvement in responding to the complaint.

41.    On more than one occasion, when Plaintiff was assigned to assess a member complaint regarding purported unauthorized charges and related matters, Plaintiff identified a regulatory compliance issue and Plaintiff was promptly removed from the assignment by Sr. V.P. Jacque Valdez.

42.    During Plaintiff's employment, Plaintiff was assigned to supervise a Federal Fair Debt Collections Practices Act lawsuit related to purported non-compliant credit reporting. Despite Plaintiff's efforts to investigate and assess the claim, Plaintiff's supervisor, Hazel Kennedy, and her subordinates, concealed from Plaintiff the facts related to the alleged violation and cause through resolution of the lawsuit. It was only after a very similar second FDCPA lawsuit was filed against Defendant GECU and Plaintiff continued pushing for information and explanations that Plaintiff's supervisor and her subordinates revealed the facts and issues regarding these claims. Plaintiff sought to develop a remedial plan to ensure any broader issues had been addressed, which was resisted by Plaintiff's supervisor, Hazel Kennedy. She ended Plaintiff's involvement in the matter without Plaintiff being informed of the specifics of the remedial plan and before the remedial plan had been completed.

43.    During Plaintiff's employment, Defendant GECU was named as a defendant in connection with a state court lawsuit regarding a restrictive covenant involving Vista Hills County Club. Defendant GECU's interest was limited as a mortgage holder on properties who were beneficiaries of the restrictive covenant. Despite the issue having no practical impact on Defendant GECU and,

7

therefore, Defendant GECU's involvement being limited, Plaintiff's supervisor refused to permit Plaintiff to represent Defendant GECU in the matter. Instead, the matter was assigned to an attorney from the Dallas Ft. Worth area who had grown up in El Paso and was familiar to Plaintiff's supervisor.

## B.  Hostile Work Environment Through Harassment

44.    Beginning approximately one week from Plaintiff's start date through Plaintiff's termination On November 5, 2023, Defendant GECU engaged in a pattern of ongoing harassment and abusive conduct towards Plaintiff because of his perceived mental disability.

45.    This conduct was intended to test Plaintiff's ability to handle stress and anxiety, consume Plaintiff's time, impede Plaintiff's work, confuse Plaintiff, impair Plaintiff's ability to understand and respond to information and communications, impair and delay Plaintiff's decision making, frustrate Plaintiff and induce errors.

### i.  Task Overload

46.    As alleged above, during his employment, Plaintiff was frequently assigned repetitive routine tasks, such as legal process requests and powers of attorney. The frequently assigned repetitive routine task assignments combined with the inefficient processes Plaintiff was required to follow reduced Plaintiff's productivity and resulted in an underutilization of Plaintiff's legal expertise.

### ii.  Provision of Incomplete or Incorrect Information and Documents with Embedded Errors

47.    Defendant GECU frequently provided Plaintiff incorrect or incomplete documents or information for assignments, requiring excessive time to confirm and diverting Plaintiff's focus from more substantive legal work. In addition, Defendant GECU frequently provided Plaintiff with vendor contracts for review containing embedded errors, requiring excessive time to identify

and correct and diverting Plaintiff's focus from more substantive legal work. Based on information and belief, in multiple instances, embedded errors were intentionally included in assigned contract review documents.

48.     On some legal process assignments, including on some purportedly emergent legal process requests where the requestor was asking for an immediate response, full information regarding the request received by Defendant GECU was not provided.

49.     This additional information, such as the cover letter or additional documentation, either answered the purported question being asked or referred to the legal authority for the request.

50.     On more than one occasion, Plaintiff's questions to Compliance clerks about whether additional information was received with the legal process request were inaccurately answered indicating what was provided was all that had been received.

51.     Plaintiff being provided incomplete or incorrect information and documents was a recurrent problem on contract reviews assigned to Plaintiff. This also occurred on complex contract reviews assigned to Plaintiff that involved multiple lengthy documents as part of the review.

52.     On multiple occasions, incorrect or incomplete contract documents for an assignment were provided by Defendant GECU to Plaintiff. On more than one occasion, incorrect or incomplete documents for an assignment were provided more than once on the same review.

53.     On multiple occasions, basic terms, such as product or service descriptions, quantities, price, term length and dates, and references to the underlying contract, included in contract documents for contract assignments provided by Defendant GECU to Plaintiff were incorrect. On more than one occasion, this occurred more than once on the same review.

54.    On multiple occasions, after Plaintiff identified and raised issues about whether the correct documents had been provided, Procurement employees or Department executives insisted they had when they had not.

55.    On multiple occasions, after Plaintiff identified and raised issues about whether the correct basic terms were included in the contract document drafts, Department executives insisted they were when they were not.

56.    In one particularly egregious circumstance, Defendant GECU was undertaking a re-negotiation with a vendor where Defendant GECU was using a consulting company to assist with the renegotiation. Plaintiff was assigned to review the new draft amended contract documents, which necessitated understanding the existing contract documents for the products and services at issue. Despite the consultant being provided all the relevant contract documents, Plaintiff was repeatedly provided incomplete documents and drafts of the new contract documents with incorrect terms, including incorrect listing of products and services. This was another circumstance where Department executives insisted Plaintiff had been provided all the relevant documents when he had not and the basic terms in the new draft documents were correct when they were not. After considerable work on obtaining and confirming this basic information, a Department executive indicated that Defendant GECU was relying on the consulting company to compile that information since the consulting firm had all the relevant documents and information. However, after additional work by Plaintiff, the Department executive acknowledged the basic terms included in the re-revised new document drafts were still incorrect. During the review, Department executives repeatedly pressured Plaintiff to complete his review despite the acknowledged open errors and issues.

57.     The problems with Plaintiff being provided incomplete or incorrect documents and information on contract review assignments resulted in Plaintiff conducting preliminary reviews of lengthy documents at times that were not germane to the actual review, delays in Plaintiff receiving correct information and documents, re-reviews for the same assignment, reduction in Plaintiff's productivity, and Plaintiff's focus being diverted from more substantive legal issues. These problems occurred with sufficient frequency that Plaintiff was uncertain about the documents and information provided and the reliability of communications with Department executives or employees. The inexplicable nature of these occurrences and communications at times left Plaintiff confused about the intentions of Defendant GECU and its executives.

### iii.  Vague or Contradictory Instructions/Priorities

58.     During his employment with Defendant GECU, Plaintiff was also given vague or conflicting instructions and priorities for completing work. These issues often combined with Plaintiff being provided incorrect or incomplete documents or information.

59.     One of the early contract review assignments given to Plaintiff was to take a "quick look" at a vendor contract associated with Defendant GECU's Employee Assistance Program. No supporting information or documents were provided. Plaintiff identified a need for Defendant GECU's Summary Plan Document or related benefits documents to be updated to align with the EAP and identified an ongoing failure to file Form 5500s. When Plaintiff met with his supervisor, Hazel Kennedy, to discuss the issues and options at resolving, she became angry and told Plaintiff "You are not here to look for problems." She indicated when Plaintiff was asked to review a contract, he should just review the contract provided.

11

60.     Plaintiff was frequently pressured to complete contract reviews even though incorrect or incomplete documents or information had been provided, pending contract documents contained material errors for such matters as the basic terms, or other material open questions remained.

61.     In Plaintiff performing contract reviews, additional information would frequently be beneficial to understand the products, services, systems and implementation and to assess and anticipate contract issues.   Plaintiff was discouraged from using his professional judgment to decide when and what additional information he required in order to complete a contract review.

62.     During his employment, Plaintiff was instructed by his supervisor, Hazel Kennedy, that communicating with non-Procurement Department executives or their subordinate employees on contract reviews was unnecessary, a distraction from those employees' duties and not to do it. At other times on contract reviews, communication with Department executives was initiated or encouraged by other executives.   However, as alleged above, those communications were frequently unreliable.

63.     Plaintiff was also encouraged at times by Defendant GECU executives to simply identify open questions or issues in contract reviews so they could be resolved by the Department before the contract was signed.  This made no sense when incorrect documents were provided or when there were open questions about which products or services and therefore which related associated contract documents were at issue. However, at times, open questions or issues were not resolved before contract execution.  For example, on a contract review in which Plaintiff was being pressured to complete his review of different but related order forms for information technology products/services, an order form was executed prematurely by a senior executive despite material open questions.  The senior executive was aware of the open questions and Department efforts to clarify it.  This was explained as an oversight.  This caused Plaintiff to begin calling Procurement

12

on contract reviews where preliminary reviews were completed but open questions remained to confirm not to allow execution until they had confirmed with Plaintiff. These requests were not always honored by Procurement.

64.    On more than one occasion during Plaintif's employment, Department executives insisted early in a review that the vendors' documents always contained the identified errors or problems, the vendors would not change or correct the documents, "it is just the way it is" and Defendant GECU does not worry about it. Such statements were made while Plaintiff was initially pressured to complete his review.

65.    For example, in one instance, such pressure to complete the review and statements were made despite the fact the issues and errors identified in the new and related document(s) under review were the cause of time-consuming challenges Defendant GECU was experiencing and concerned about avoiding in the future. This included such basic matters as confirming which existing order forms were operative and were being charged for, which was important in correctly entering into the amendment.

66.    Plaintiff was asked to review a marketing agency agreement by Defendant GECU to govern a relationship with a potential new marketing agency from Austin, Texas. Defendant GECU's CEO, Crystal Long, instructed Plaintiff she wanted to turn it around quickly because she wanted the option to use the firm for some simple public relations consulting in the near term as issues arose, but wanted the agreement to cover the issues for a broader long-term marketing relationship with the agency. She further instructed Plaintiff to work with Defendant GECU's Vice President of Communications, Enrique Zaragoza, on the particulars given his managerial responsibility for marketing and his significant experience in the advertising sector. Plaintiff suggested to Crystal Long the option of quickly entering into a limited marketing agreement covering near term public

relations, which would permit the parties time to prepare a better drafted marketing agency agreement suitable for a broader long term relationship and covering the risks and other issues adequately for a federal credit union. Crystal Long said "no".

67.     Enrique Zaragoza instructed Plaintiff Defendant GECU's priority was to ensure the vendor agreement was adequate to cover a long term broad relationship for marketing services, including advertising production and buys. He further instructed Plaintiff it was critical that the agreement protected Defendant GECU and addressed among other issues risk, intellectual property, and full clarity and transparency on costs and expenses.

68.     The draft agreement from the vendor was inadequate. Among other issues, it failed to address critical issues, was structured poorly and contained absurd embedded errors and inconsistencies. This was acknowledged by the vendor, who admitted using his agreement would be more like a hand-shake relationship, which Enrique Zaragoza confirmed was unacceptable.

69.     Plaintiff discussed the issues and options and it was agreed a new agreement would be drafted. Defendant GECU and the vendor agreed Plaintiff would draft it.

70.     Plaintiff prioritized drafting the agreement while attending to other deadlines and purported emergencies. During the drafting, Plaintiff was repeatedly told to hurry up and just finish the contract by Crystal Long and Hazel Kennedy.

71.     On one complex contract review assigned by Fernando Ortega where Defendant GECU was still under an old legacy structure of contract documents, Plaintiff was instructed a priority review was needed based on one structure of new lengthy contract documents and only after those documents were reviewed was Plaintiff advised Defendant GECU never intended to use the structure reviewed and that the review was not really emergent. This priority assignment was

assigned soon after Plaintiff had been asked to commit to another complex contract review with a challenging deadline.

72.     On a software/service contract review assignment related to the Mortgage Department, Sr. V.P. Lettie Ramos and other executives provided inconsistent and confusing instruction and information about the products/services and the Department's intended implementation, which were critical to ensuring adequate contract provisions. The software contract contained errors, vague language, come of which even the vendor could not explain, and a beta testing addendum that prohibited production use of a component of the software/service, yet Sr. V.P. Lettie Ramos and other executives provided conflicting instruction about whether Defendant GECU intended to use the software in production. During the review, despite open questions about critical issues, Plaintiff was pressured by Lettie Ramos and other executives to not overcomplicate the review and just complete it. Plaintiff initiated a discussion with Lettie Ramos to understand why Plaintiff was continuing to receive conflicting information and instructions relevant to important contract provisions and Lettie Ramos told Plaintiff it was because she wanted to use the outside counsel she had been accustomed to using on reviews for her Department rather than Plaintiff.

73.     Plaintiff was assigned to review a mortgage loan purchase and sale agreement for a potential new vendor. Included in the document packet received from Defendant GECU was a power of attorney document for use as part of the transactions contemplated by the agreement purportedly prepared and submitted by the vendor. The power of attorney was absurdly invalid and contrasted starkly with the sophistication of the other contract documents submitted by the vendor. This document, if submitted by and requested to be signed by the vendor, raised questions about the vendor's diligence and intentions. Plaintiff advised it was imperative to have a discussion with the vendor to express concern about the power of attorney form, to confirm the

vendor intended to send the document and to confirm the vendor was requesting Defendant GECU to sign the document. Plaintiff requested to contact the vendor to address the issue, but this request was denied by a GECU executive.

74.     Plaintiff was given an assignment by the new Sr. V.P. and Director of Human Resources, Elsa Borrego, to take a quick look at an employee relocation agreement. Elsa Borrego had worked at Helen of Troy and her start date of employment at Defendant GECU was the same as Plaintiff. Ms. Borrego provided Plaintiff the very short (half page) draft letter agreement and said she had negotiated a bunch of them during her career and it looked fine. Not only was the "agreement" inadequate in failing to comply with basic legal requirements and in failing to address Defendant GECU's purported priorities, but she later acknowledged she was aware of this when the assignment was made. During this review, Plaintiff was pressured to complete the review.

75.     During Plaintiff's employment, Plaintiff was assigned to review a vendor submitted contract for repossession services. The contract contained so many inconsistencies and embedded errors, including in the important but basic boilerplate clauses, that reworking the agreement would take longer than drafting a new agreement. The inconsistencies and errors were so absurd and numerous it appeared someone embedded them on purpose.

        iv.  Hostile Communications

76.     During Plaintiff's employment, he had a meeting with his supervisor, Hazel Kennedy, in which she advised Plaintiff his fellow employees regarded him as "different." Plaintiff sought clarification of this comment, which was not provided.

77.     As part of Plaintiff's nominal role in supervising litigation, he communicated and worked with a particular department on personal injury claims/lawsuits responsible for gathering information related to such incidents. At one point during his employment, when Plaintiff sought

to obtain information about a claim from that Department, Plaintiff was advised by the Department that they had been instructed to cease communication with Plaintiff by Fernando Ortega as Plaintiff was taking up too much of their time. Plaintiff's prior communications with the Department had been occasional, limited and focused. When Plaintiff raised this with Executive V.P. Fernando Ortega, he dismissed the issue as a "miscommunication", but the Department's ambivalence persisted.

78.     During Plaintiff's employment, he raised a compliance and privacy issue regarding information sharing with law enforcement with Defendant GECU's Risk Manager, Bernadette Ramos, and was told Plaintiff should "stay out of it if [he] knew what was good for him." When Plaintiff raised the issue with his supervisor, she refused to address the subject, although she appeared amused.

79.     During Plaintiff's employment, the headquarters building at 1225 Airway Blvd. suffered a brief complete power outage. Daniel Vasquez, whom Plaintiff had worked with on some assignments as an outside counsel, and CEO Crystal Long, entered Plaintiff's office together. Crystal Long mentioned the power outage and said something to the effect of "now we can talk freely." She seemed to be implying they could not talk freely in Plaintiff's office or the building absent the power outage.

80.     On multiple occasions during Plaintiff's employment, when Plaintiff arrived at work in the morning after working late and leaving his office door locked the night before, Plaintiff unlocked his office with his unique key to find his telephone unplugged, his computer terminal unplugged or his monitor turned off. Office doors were required to be locked if work was left out and janitorial staff who cleaned in the evenings did not have keys to unlock offices. Plaintiff generally worked

later than all other executives whose offices were in the key card accessed executive suite. The only executive in the executive suite who worked as late as Plaintiff was Alex Rascon.

81.    On or about July 11 or 12, 2024, CEO Crystal Long entered Plaintiff's office and raised an issue she had raised previously about whether Plaintiff's legal opinion was that Defendant GECU should purchase real estate the subject of an existing branch lease with a vendor with whom Defendant GECU had a good long-term working relationship, not for business reasons, but instead due to a legal concern. This issue had been raised with Plaintiff on prior occasions. Plaintiff again expressed his opinion such a purchase would be an acceptable business decision, but he did not see a legal concern that would cause Plaintiff to opine a purchase was necessary. Crystal Long reacted with displeasure and informed Plaintiff they would get together early the next week to "see what you think then." Plaintiff did not hear from Crystal Long about the issue the following week or again during his employment.

82.    Based on information and belief, Plaintiff was given some assignments regarding legal issues Defendant GECU did not really have questions about.

83.    Based on information and belief, Plaintiff was assigned contrived assignments regarding legal issues Defendant GECU did not really have questions about.

84.    The incidents described throughout Section 4 above are some examples of the numerous such incidents Plaintiff experienced during his employment with Defendant GECU. These incidents created uncertainty and confusion about the intentions and reliability of the communications and information from Defendant GECU. This uncertainty and confusion hampered Plaintiff's productivity and decision making and diverted Plaintiff's focus from substantive legal issues.

85.    Plaintiff was terminated by his supervisor in the evening of November 5, 2024, which was election day. Based on information and belief, this specific date was chosen by Defendant GECU in part due to the communication timing referenced above that had occurred on July 11 or 12, 2024 just prior to the Butler assassination attempt.

86.    Plaintiff's termination was motivated by Defendant GECU's perception that Plaintiff had a mental disability, as evidenced by differing treatment from prior in-house counsel, exclusion from typical in-house counsel duties and the pattern of harassing and abusive conduct engaged in by Defendant GECU.

87.    Defendant GECU's actions caused Plaintiff severe emotional distress, including anxiety, sleeplessness, depression, hopelessness and medical problems.

88.    Upon information and belief, Defendant GECU offered plaintiff employment with the intent to engage in the discriminatory and harassing conduct described above, knowing such conduct would marginalize Plaintiff and lead to termination. Defendant GECU's representations about the role were false, as evidenced by the immediate exclusion of Plaintiff from typical in-house counsel duties and pattern of harassment and abuse.

89.    Defendant GECU's actions, including creating a hostile work environment and termination, were motivated by Defendant's perception of Plaintiff as disabled in violation of the ADA.

90.    Prior to filing this Complaint, Plaintiff timely filed a charge of discrimination with the Equal Opportunity Commission on May 3, 2025 alleging disability discrimination. On May 22, 2025, the EEOC issued a Notice of Right to Sue. This action is filed within 90 days of receipt of the Notice of Right to Sue as required by 42 U.S.C. § 2000e-5(f)(1).

## V. CAUSE OF ACTION: VIOLATION OF TITLE I OF THE ADA

91.     Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

92.     Defendant GECU is an employer subject to the ADA, 42 U.S.C. § 12111(5).

93.     Title I of the ADA, 42 U.S.C. § 12112(a) prohibits discrimination against a qualified individual on the basis of disability in regard to job application procedures, hiring, advancement, discharge, compensation, job training, and other terms, conditions and privileges of employment.

94.     Defendant GECU regarded Plaintiff as having a disability within the meaning of 42 U.S.C. § 12102(1)(C).

95.     Plaintiff was a qualified individual under the ADA, capable of performing the essential functions of the position. Plaintiff possessed a law degree, over twenty years of legal experience, and over ten years of legal experience working for Defendant GECU as an outside counsel. Defendant GECU invited unsolicited Plaintiff to become Defendant GECU's in-house general counsel.

96.     Defendant GECU discriminated against Plaintiff by subjecting Plaintiff to a hostile work environment motivated by Plaintiff's perceived mental impairment.

97.     Defendant GECU's employees engaged in unwelcome harassing conduct as alleged in Section 4 above. The harassment was sufficiently severe or pervasive to alter the conditions of Plaintiff's employment and create an abusive working environment. The conduct caused Plaintiff to feel humiliated and degraded. Plaintiff subjectively perceived the work environment as hostile and a reasonable person in Plaintiff's position would also find the environment hostile or abusive. Defendant GECU knew or should have known about the harassment because the conduct occurred openly in the workplace, but failed to take prompt and effective remedial action. The harassment was directly related to Defendant GECU's perception of Plaintiff as having a disability.

98.     Defendant terminated Plaintiff's employment on November 5, 2024 because of Plaintiff's perceived mental impairment, using pretextual performance issues.

99.     Defendant GECU is vicariously liable for the harassing and discriminatory conduct of its executives, who acted within the scope of their supervisory authority, and for the conduct of its non-supervisory employees, as Defendant GECU knew or should have known about the harassment and failed to take prompt and effective remedial action.

100.    Defendant's actions were intentional and/or with reckless indifference to Plaintiff's federally protected rights.

101.    As a direct and proximate result of Defendant GECU's discriminatory conduct, Plaintiff has suffered damages, including but not limited to lost wages, lost benefits, emotional distress, and other economic and non-economic harms.

## VI. CAUSE OF ACTION: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

102.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

103.    In the alternative, if the Court finds that Defendant GECU's conduct does not violate the ADA, Defendant GECU's actions constitute IIED under Texas law.

104.    Defendant GECU's conduct, including relentless harassment, was extreme and outrageous, exceeding all bounds of decency tolerated in a civil society.

105.    Defendant GECU is vicariously liable for the harassing and abusive conduct by its senior executives, as vice principles, and other employees who acted within the scope of their authority.

106.    Defendant GECU acted intentionally or recklessly, knowing or disregarding the likelihood that its conduct would cause severe emotional distress.

107.    Defendant GECU's conduct caused Plaintiff severe emotional distress, including anxiety, sleeplessness, depression, hopelessness and medical problems.

21

108.    Defendant GECU's actions proximately caused Plaintiff's damages, including emotional distress and other economic and non-economic harms.

## VII. CAUSE OF ACTION: FRAUD

109.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

110.    In the alternative, if the Court finds that Defendant GECU's conduct does not violate the ADA or constitute IIED, Defendant GECU committed fraud under Texas law.

111.    Defendant GECU made material misrepresentations to Plaintiff by offering employment as in-house counsel with responsibilities typical of the role, knowing these representations were false and intending to subject Plaintiff to discriminatory and harassing conduct.

112.    Defendant GECU intended for Plaintiff to rely on these misrepresentations to accept employment.

113.    Plaintiff justifiably relied on Defendant GECU's representations by accepting the position.

114.    Defendant GECU is vicariously liable for the fraudulent conduct by its senior executives, as vice principles, and other employees who acted within the scope of their authority.

115.    Defendant GECU's misrepresentations proximately caused Plaintiff's damages, including lost wages, emotional distress, and costs associated with accepting the employment.

## VI. REQUEST FOR RELIEF

116.    WHEREFORE, Plaintiff respectfully requests that this Court:

    A.    Enter judgment in favor of Plaintiff and against Defendant GECU on all claims;

    B.    Award Plaintiff compensatory damages in an amount to be determined at trial, including but not limited to lost wages, emotional distress and medical expenses, in an amount to be determined at trial;

C.      Award Plaintiff punitive damages for Defendant GECU's willful and reckless conduct;

D.      Order Defendant GECU to reinstate Plaintiff to the position of general counsel or, in the alternative, award front pay;

E.      Award Plaintiff reasonable attorney's fees, costs, and expenses pursuant to 42 U.S.C. § 12205;

F.      Grant such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

117.    Plaintiff hereby demands trial by jury on all issues so triable.

DATED: August 20, 2025

Respectfully submitted,

Mark E. Smigiel, Esq./s/
TX Bar No. 24025652
6275 Viale Del Sol Ave.
El Paso, Texas 79932
(915) 227-5787
marksmigiel@gmail.com
*Pro Se*